UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| MIKE MADANI, ANDRE VAN DER VALK, ROSHAN GUPTA, KYONG-UK CHUNG, ARBORZ PETROLEUM, INC., MIKE BEHRAZFAR, ASHKAN CORPORATION, JAMES KIM, SABAN INVESTMENT, LLC, RANJIT JOEA, RICK-MIK ENTERPRISES, INC., WILL Y. WONG,<br><br>          Plaintiffs,<br><br>    v.<br><br>EQUILON ENTERPRISES LLC, a Delaware Limited Liability Company dba Shell Oil Products US, ROBERT MUSTAIN, an individual; and DOES 1 through 10, Inclusive,<br><br>          Defendants. | CASE NO. CV 04-10370 JVS (JTLx)<br><br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING PLAINTIFFS' CLAIMS FOR INJUNCTIVE RELIEF |

On June 26, 2007, the Court granted the Motion of Equilon Enterprises LLC ("Equilon") for Judgment as a Matter of Law on plaintiffs' claims for damages at the close of evidence pursuant to Rule 50(a) of the Federal Rules of Civil Procedure.  The Court now resolves plaintiffs' remaining claims for equitable relief under Sections 21200 and 17200 of the California Business and Professions Code.

I.    Findings of Fact.

Background

1.  On December 20, 2004, twelve current and former dealers of Shell-branded gasoline filed this suit against defendant Equilon, initially raising nine claims.  (Docket No. 1.)    The plaintiffs proceed here on their Third Amended Complaint.  (Docket No. 51.)  Through orders of dismissal, stipulations of dismissal or settlement agreements,[1] all claims were dismissed prior to trial except for the claims of six plaintiffs for wholesale price discrimination under California Business & Professions Code § 21200 and their related claims for unfair business practices under California Business & Professions Code § 17200.  Plaintiffs sought damages and injunctive relief.

2.  Plaintiffs Mike Madani, Alborz Petroleum, Inc., Ashkan Corporation, Saban Investment, LLC, and Will Y. Wong currently operate

---

[1]  Docket Nos. 56, 61, 65, 66, 70, 75, 81, 82, 85, 86, 117, 144-47, 149, 152, 337.

1 Shell-branded motor fuel stations as Equilon franchisees.[2]  Plaintiff James Kim

2 formerly operated a Shell-branded station as an Equilon franchisee.  Because

3 plaintiff Kim is no longer an Equilon franchisee, he is not pursuing a claim for

4 injunctive relief.[3]

5

6     3.  Equilon was formed in 1998 through an alliance between entities

7 affiliated with Texaco, Inc. and Shell Oil Company to refine and market motor fuel

8 sold under both Shell and Texaco brand names at various service stations.[4]

9 Equilon had, at all times relevant to the claims herein, the right to use and sublicense

10 the use of certain Shell and Texaco trademarks.

11

12     4.  At all relevant times, each plaintiff sold motor fuel to the public at

13 the retail level that it purchased from Equilon at wholesale dealer tank wagon

14 ("DTW") prices pursuant to supply agreements for motor fuel.

15

16     5.  In addition to selling gasoline to franchisee-dealers like plaintiffs at

17 DTW prices, Equilon also sells gasoline to the public at stations run by non-

18 franchised operators under contract with Equilon.  These stations are sometimes

19 referred to as "company-operated stations," COROs, or MSOs.

20

21                    Equilon's Zone Pricing System

22

23     6.  After its formation, Equilon endeavored to create a wholesale

24 pricing system for all its former Shell and Texaco dealers pursuant to which

25

26 ───────────────

     [2] Stipulated Facts, as set forth in Parties' Joint Pretrial Conference Order,
27 dated May 25, 2007 ("Stipulated Facts"), at 3-4.

28     [3] Stipulated Facts at 4.
     [4] Stipulated Facts at 3.

Equilon charged the same wholesale prices to all dealers who engaged in substantial competition with each other for sales of motor fuel.[5]  Richard Broderick, Equilon's former Manager of Pricing Operations, testified that in creating its new pricing system, it was important to Equilon to use an objective and uniform process throughout its entire network of retail service stations to identify which Equilon dealers compete with each other.[6]

7.  To assist in the process of creating "price zones" that grouped its dealers according to their localized competition, Equilon hired MPSI Relations, Inc. ("MPSI"), an independent consultant firm.[7]  Broderick testified that with MPSI's assistance, Equilon sought to create price zones that accurately reflected its dealers' localized competition, regardless of the geographic size of or the number of dealers contained in the price zones.[8]  Witnesses for both sides testified that price zones are commonly used in the oil industry and can be beneficial to motor fuel dealers such as plaintiffs where they accurately reflect competition and enable dealers to respond to localized competition.[9]

8.  MPSI has more than 35 years of experience evaluating competitive markets for many of the world's major oil companies and other major franchisors.[10]  MPSI, located in Tulsa, Oklahoma, has approximately 75 full-time

---

[5] References to the trial transcript are indicated by date and volume.  June 12, 2007, Vol. 1, 42:3-44:14, 66:17-22.

[6] June 12, 2007, Vol. 1 at 53:12-18.

[7] June 12, 2007, Vol. 1 at 44:15-45:1; June 19, 2007, Vol. 2 at 8:21-25.

[8] June 12, 2007, Vol. 1 at 58:11-25.

[9] June 5, 2007, Vol. 2, at 10:24-11:9, 11:20-12:7; June 15, 2007, Vol. 2 at 52:17-24.

[10] June 19, 2007, Vol. 1 at 51:7-18; Vol. 2 at 4:9-16, 5:10-12

employees and employs hundreds of contractors to collect data and perform other services.[11]

9.  MPSI does not warrant that the result of its model necessarily comply with either state or federal price discrimination statutes.[12]

10.  Don Spears, the Managing Director of Global Pricing Solutions for MPSI, testified concerning MPSI's methodology for creating proposed price zones for Equilon.[13]  Spears, a trained economist, has worked for MPSI for more than 18 years and personally developed the concept for MPSI's "price zone modeling system," which MPSI used to create price zones for Equilon.[14]

11.   The purpose of MPSI's price zone modeling system is to develop price zones for a client that contain within them all the client's dealers that effectively compete with each other for the same customers.[15]  MPSI's price modeling system enables it to predict how much volume will be gained or lost at a given motor fuel station in response to a price change, and how that price change will affect volumes at competing stations.[16]

12.  MPSI used the same methodology to create proposed price zones for every motor fuel station in Equilon's network throughout the U.S., including

---

[11]  June 19, 2007, Vol. 2 at 5:3-9.
[12]  May 30, 2007, Vol. 1 at 81:21-82:6; June 19, 2007, Vol. II at 77-79.
[13]  June 19, 2007, Vol. 2 at 6:4-13.
[14]  June 19, 2007, Vol. 2 at 4:23-25, 7:2-4, 12:16-19.
[15]  June 19, 2007, Vol. 2 at 8:6-15, 99:3-6.
[16]  June 19, 2007, Vol. 2 at 34:5-10.

plaintiffs' stations.[17]  The first step in that process was the preparation of "market area studies" for each of the geographic markets in which Equilon sought to create price zones.[18]

13.  To prepare a market area study, MPSI collects information regarding the "supply side" of the subject market, including over one hundred data points for every retail motor fuel station in the subject market, as well as information regarding the "demand side" of the market, such as population data, income levels and traffic counts.[19]  Spears testified that preparing a market area study for a market the size of Los Angeles involves many MPSI employees and takes approximately two weeks to complete.[20]

14.  On the supply side of the market area study, MPSI collects extensive data concerning the retail gasoline market to enable it to isolate the effects on the entire market of changes in a single variable at a motor fuel station, such as the retail price of gasoline, the addition of a canopy, or the addition of more fuel pumps.[21]  MPSI collects supply-side data concerning all motor fuel stations in the subject market, regardless of the brand of motor fuel sold at those stations.[22]  The information that MPSI collects about each motor fuel station in the subject market, as set forth on Trial Exhibit 1363, includes the characteristics of the neighborhood in which the station is located, the lot size, number of fuel pumps, physical appearance, offerings (such as car wash, oil and lube service, convenience store),

---

[17]  June 19, 2007, Vol. 2 at 55:14-56:8.
[18]  June 12, 2007, Vol. 1 at 49:22-50:9; June 19, 2007, Vol. 2 at 14:24-15:21.
[19]  June 19, 2007, Vol. 2 at 16:1-14; Exhibit 1363.
[20]  June 19, 2007, Vol. 2 at 35:2-15.
[21]  June 19, 2007, Vol. 2 at 33:12-34:4.
[22]  June 12, 2007, Vol. 1 at 50:23-51:2; June 19, 2007, Vol. 2 at 18:4-8.

1  hours of operation, accepted forms of payment, street and traffic conditions, retail

2  prices and volumes sold.[23]

3

4          15.  MPSI collects data for the supply-side of its market area studies

5  from reliable sources.  For example, MPSI relies on the same traffic data and

6  studies on which local governments rely for their own planning purposes.[24]  MPSI

7  obtains volume data directly from its clients and by interviewing gas station

8  operators and attendants, monitoring gasoline deliveries and reading fuel pump

9  meters.[25]

10

11         16.  On the demand side of the market area study, MPSI analyzes,

12  among other things, how many consumers live in a particular area and their income

13  levels.[26] Again, MPSI collects empirical data from reliable sources such as the U.S.

14  Census Bureau.[27]

15

16         17.  Once MPSI has determined how many people live in an area and

17  their income levels, it estimates how many cars those people own and how much

18  they drive, which enables MPSI to calculate the estimated demand for gasoline.[28]

19  MPSI then apportions the demand for gasoline in the subject market among the

20  various intersections in the market.[29]

21

22

23  _____

24     [23]  June 19, 2007, Vol. 2 at 20:6-23:10, 24:2-25:25, 26:6-27:5, 27:6-28:20,
    29:21-31:16; Exhibit 1363.
25     [24]  June 19, 2007, Vol. 2 at 23:13-23.
       [25]  June 19, 2007, Vol. 2 at 31:12-33:5.
26     [26]  June 19, 2007, Vol. 2 at 34:17-22.
       [27]  June 19, 2007, Vol. 2 at 37:11-20.
27     [28]  June 19, 2007, Vol. 2 at 38:21-24.
28     [29]  June 19, 2007, Vol. 2 at 38:25-40:4.

18.  After collecting the supply and demand side data for the subject market, MPSI "balances the market" by identifying the gas stations that supply the gasoline demanded in each area of the market.[30]  By balancing the market so that excess supply in one area of the market is consumed by consumers who travel from another area of the market, MPSI accounts for the fact that consumers commute from their homes and may purchase gas at locations far from where they live.[31]

19.  After completing a balanced market area study for a given market, MPSI conducts price modeling to isolate the effect of a price change at one station on the volumes of other stations.[32]  Based on MPSI's recommendation, Equilon and MPSI agreed to conduct price modeling for Equilon's price zones according to parameters that measure whether a 3% price change at one station affects volumes at any other stations by at least 4,000 gallons.[33]  Spears testified that MPSI has created price zones using the 3% price change/4,000 gallon parameters for clients throughout the U.S. for many years.[34]  Spears also testified that, in his experience, those parameters give "excellent" results that withstand the test of time.[35]

20.  As the final step in its creation of price zones, MPSI runs multiple iterations of its price modeling to first identify competitors of the subject motor fuel station that meet the 3% price change/4,000 gallon criteria, and then identify competitors of the competitors of the subject station that meet that

---

[30] June 19, 2007, Vol. 2 at 40:19-41:25.
[31] June 19, 2007, Vol. 2 at 42:3-22.
[32] June 19, 2007, Vol. 2 at 43:1-5.
[33] June 12, 2007, Vol. 2 at 14:20-15:7; June 19, 2007, Vol. 2 at 47:22-25, 53:10-14.
[34] June 19, 2007, Vol. 2 at 54:24-55:3.
[35] June 19, 2007, Vol. 2 at 52:8-53:25.

criteria.[36]  After identifying all stations that meet the stated criteria, MPSI draws a boundary around those stations, and refers to that area as a "Competitive Impact Area."[37]  MPSI's price modeling process identifies a Competitive Impact Area for each motor fuel station in an oil company's network; the areas in which those Competitive Impact Areas overlap are deemed "price zones."[38]  MPSI then adds a "buffer" around the price zone, typically of one tenth of one mile in all directions, so that additional stations that are very close in proximity to the stations already in the price zone will be included in the same zone.[39]

21.  Equilon provided MPSI two key inputs for the model: the price change parameter and the volume transfer parameter.  The model provided for a price change of 1 to 10 %, with 5 % as a default.[40]  The model provided for volume selections from 1,000 to 5,000 gallons.[41]  Equilon chose the combination of 3 %/4,000 gallons.[42]

22.  Other combinations would have produced larger zones: specifically, the use of a higher percent or a lower volume.[43]  The Court does not find that the parameters chosen by Equilon were not unreasonable.

23.  After MPSI completed its proposed price zones, Equilon conducted a 'field validation" in which Equilon's local sales managers and sales consultants in the subject markets confirmed that MPSI's proposed price zones

---

[36] June 19, 2007, Vol. 2 at 48:8-49:5.
[37] June 19, 2007, Vol. 2 at 49:6-13.
[38] June 19, 2007, Vol. 2 at 49:17-23.
[39] June 19, 2007, Vol. 2 at 50:17-51:1.
[40] May 30, 2007, Vol. 1 at 79:10-80:1.
[41] May 30, 2007, Vol. 1 at 82:17-20.
[42] May 30, 2007, Vol. 1 at 81:1-3, 83:2-6.
[43] May 30, 2007, Vol. 1 at 80:13-20, 82:17-83:6.

1  reflected their local knowledge and accounted for current competitive conditions.[44]

2  Equilon did not simply "rubber stamp" the results of the MPSI Model.[45] Equilon's

3  General Manager, William Spurgeon, testified that Equilon's staff who participated

4  in the field validation process are experts in their local areas and are familiar with the

5  volumes, margins and operators of each of the Shell stations in a particular area.[46]

6  Don Spears testified that he often has participated in Equilon's field validation

7  process to ensure that Equilon makes no modifications to MPSI's proposed price

8  zones that impinge upon the integrity of MPSI's price modeling system.[47]

9

10      24.     Broderick testified that during Equilon's field validation process,

11  Equilon employees did not refer to dealers by their names to ensure that the

12  process was "blind" and did not allow for price zones to be created or modified to

13  punish or assist a specific dealer.[48]  Broderick also testified that Equilon has never

14  sought to create or modify a price zone to allow the company to more easily punish

15  or reward a particular dealer.[49]

16

17      25.     Since implementing Equilon's price zones, both MPSI and

18  Equilon have periodically reviewed those price zones to account for changes in the

19  competitive environment, including station closures, new station openings, and

20  street and freeway changes.[50]

21

_____

22      [44]  June 5, 2007, Vol. 2 at 19:20-20:9, 22:6-23:5, 85:2-11; June 12, 2007, Vol.

23  1 at 45:2-12, 55:19-56:17.

        [45]  June 5, 2007, Vol. 2 at 22:6-23:5.

24      [46]  June 5, 2007, Vol. 2 at 24:5-11, 24:19-25:6, 85:24-86:9; June 12, 2007,

25  Vol. 1 at 56:18-57:15.

        [47]  June 19, 2007, Vol. 2 at 56:12-19, 57:21-58:3.

26      [48]  June 12, 2007, Vol. 1 at 57:21-58:25.

        [49]  June 12, 2007, Vol. 1 at 67:2-11.

27      [50]  June 5, 2007, Vol. 2 at 17:5-17; June 12, 2007, Vol. 1 at 63:11-66:22; June

28                                                      (continued...)

26. The Court finds that the methodology Equilon used to create plaintiffs' price zones was reliable and objective and produced reasonable results.

27. MPSI collected substantial empirical data from reliable sources and conducted its price testing using in a manner that was sufficient to identify all dealers in a given area who engage in significant competition with each other for sales of motor fuel. Equilon's field validation confirmed the accuracy of MPSI's proposals and resulted in modifications where necessary.

28. Don Spears testified that each plaintiff's Equilon price zones at issue in this case is consistent with the competitive areas that resulted from MPSI's price modeling system.[51]

29. Neither of plaintiffs' expert criticized the MPSI, and both had used it in their business activities.

30. Although plaintiffs' geographic market expert, Stephen Schrader, offered a different set of market areas for the plaintiffs' operations, he had no criticism of MPSI's methodology, and stated that he was "not qualified" to opine on whether Equilon's methods for establishing its price zones were proper.[52] When Schrader worked for Arco, Arco used MPSI to help it determine where to locate new gas stations.[53] David R. Kamerschen, also has used MPSI to assist him

---

[50] (...continued)
19, 2007, Vol. 2 at 13:16-14:19; Trial Exhibit 5 Broderick Deposition.

[51] June 19, 2007, Vol. 2 at 60:11-61:1, 64:6-7, 64:20-65:7.

[52] June 19, 2007, Vol. 1 at 29:25-30:24, 34:1-4.

[53] June 19, 2007, Vol. 1 at 11:24-12:11.

in defining the relevant geographic market for his oil company clients.[54] Kamerschen testified that he has "no problem" with using MPSI as Equilon did -- as a "starting point" for conclusively determining which stations compete with each other.[55]  Equilon's field validation process indicates that Equilon proceeded just as Kamerschen suggested they should.

31.    Plaintiffs' primary criticism of Equilon's price zones is that they are too small.  However, Spears testified that the size of MPSI's price zones reflect the density of the retail gasoline stations in the subject markets, and that they may be geographically large or small.[56]  MPSI's price zones also may be unusually shaped because MPSI's price modeling system is designed to create price zones that contain the smallest geographic space necessary to contain all the competitors in the price zone.[57]  Schrader testified that "there is no general rule that price zones should be a certain square area," and that smaller price zones better enable oil companies to respond to local competitive conditions.[58]  Indeed, Schrader testified that because Arco made its zones smaller, it was able to stay competitive and respond to localized price changes.[59]

32.  To the extent that plaintiffs contend that Equilon adopted the zones intent to manipulate the zone to the detriment of its dealers, the Court finds that the contention is irrelevant and unsupported.[60]

---

[54] May 31, 2007 at 53:13-18.
[55] May 31, 2007 at 53:8-54:1.
[56] June 19, 2007, Vol. 2 at 49:24-50:2.
[57] June 19, 2007, Vol. 2 at 50:3-14.
[58] June 15, 2007, Vol. 2 at 28:7-16, 53:5-7.
[59] June 15, 2007, Vol. 2 at 53:8-13.
[60] Order re Equilon's Motions *in Limine*, May 21, 2007, Docket No. 402, p. 2.

## Scope of Plaintiffs' Competition

33.    To prove that they compete with Equilon dealers outside their Equilon price zones, plaintiffs relied on the testimony and analysis of Stephen Schrader.  Although Schrader had a lengthy career in the retail gasoline business, the Court did not find his analysis or conclusions credible.  The most glaring example was the single pricing zone which he constructed the Ashkan station.  It included for the virtually the entire San Fernando Valley, spread over 91 square miles and included 153 stations.  See ¶ 42, infra.

34.    Schrader currently operates a consulting firm that is focused on marketing activities related to gasoline stations and convenience food stores.[61] Prior to that, Schrader held various positions for Arco.[62]  Schrader has been retired from the oil industry since 2000.[63]  Schrader is not a trained economist.[64]  Other than his involvement with the creation of price zones for Arco's dealers in the 1980's, Schrader did not testify that he has any other experience analyzing competitive conditions in the motor fuel industry or creating price zones for oil companies.  Schrader also testified that he has never consulted any academic literature concerning areas of competition for gas stations.[65]

35.    To analyze whether plaintiffs' price zones appropriately capture their competition, Schrader reviewed maps depicting Equilon's price zones for the plaintiffs, as well as other maps showing the locations of "traffic generators," which Schrader described as "things that create demand," such as hospitals and shopping

---

[61] June 15, 2007, Vol. 1 at 84:1-5.
[62] June 15, 2007, Vol. 1 at 85:15-90:6.
[63]  June 19, 2007, Vol. 1 at 42:24-43:2.
[64] June 19, 2007, Vol. 1 at 25:15-16.
[65] June 19, 2007, Vol. 1 at 25:17-22.

centers.[66]  Following his review of those maps, Schrader spent approximately two days driving around the areas surrounding each of the plaintiff's stations and making visual observations concerning "traffic generators."[67]  Schrader then created alternate price zones for each plaintiff by drawing boundaries on maps around certain geographic areas.

36.     Schrader's methods for analyzing plaintiffs' Equilon price zones were inadequate.  The Court finds that MPSI's analysis far more credible than Schrader's reliance on driving around the areas in which the plaintiffs' stations are located and making visual observations.[68]  Schrader admitted that he did not create "complete" price zones for the plaintiffs that incorporate all relevant factors.[69]

37.     Schrader created his price zones for plaintiffs without considering any non-Shell-branded stations,[70] even though, the evidence, including plaintiffs' testimony, shows that plaintiffs effectively compete with stations of all brands.[71]  However, he also testified that considering key competitors of all brands relevant and important in the creation of complete price zones, and that when he was involved in creating price zones for Arco, he in fact considered motor fuel stations of all brands.[72]  This is a major flaw in his analysis.  The Court finds that Schrader did not reasonably or credibly determine which Shell stations compete with each other without taking into account the number or quality of other

---

[66]  June 15, 2007, Vol. 1 at 103:15-25, 108:16-109:19.
[67]  June 15, 2007, Vol. 1 at 109:8-19.
[68]  June 12, 2007, Vol. 1 at 46:25-49:21.
[69]  June 15, 2007, Vol. 2 at 59:7-12.
[70]  June 15, 2007, Vol. 2 at 58:14-18; June 19, 2007, Vol. 1 at 5:9-15.
[71]  June 6, 2007, Vol. 1 at 76:12-77:16, 92:2-18; June 6, 2007, Vol. 2 at 26:22-27:5; June 7, 2007, Vol. 2 at 46:10-16, 48:14-23; Sealed Transcript at 9:18-10:3; June 20, 2007, Vol. 2 at 17:15-18:12.
[72]  June 15, 2007, Vol. 2 at 57:5-23, 58:14-59:6.

1  competitors in the area, particularly those located between the plaintiffs and other

2  Shell stations.

3

4       38.    Schrader also did not consider any empirical data, including the

5  volumes sold at any stations, the retail prices charged at any stations, traffic counts,

6  or driving times or distances between stations.[73]  Schrader admits that traffic

7  counts could have provided empirical data to validate whether his visual

8  observations were correct.[74]

9

10      39.    Schrader testified that part of the process of creating price

11  zones involves evaluating whether those price zones actually work over time,

12  including testing whether price changes at one station actually impact the volumes

13  of another station.[75]  In creating price zones for the plaintiffs, Schrader did not use

14  the "test of time" to determine whether empirical data validated the price zones he

15  created.[76]

16

17      40.    The evidence established that the creation of price zones is a

18  collaborative process.  Schrader created his price zones for plaintiffs without

19  consulting with any other person, including trained economists or the plaintiffs

20  themselves.[77]  Schrader testified that when he worked for Arco, many people were

21  involved in creating Arco's price zones, including Arc's sales representatives in the

22

23

24       [73] June 19, 2007, Vol. 1 at 5:22-6:7, 11:22-23, 13:21-14:5, 27:6-10; Sealed

25  Transcript, at 7:16-8:12.

          [74] June 19, 2007, Vol. 1 at 12:23-13:20.

26        [75] June 19, 2007, Vol. 1 at 37:8-38:11.

          [76] June 19, 2007, Vol. 1 at 43:5-18.

27        [77] June 19, 2007, Vol. 1 at 16:24-17:5, 20:20-22, 24:24-25:12; Sealed

28  Transcript at 7:9-12.

1  field, administrative staff, pricing department and legal department.[78]

2  Representatives from MPSI and Equilon, as well as plaintiffs' expert, David

3  Kamerschen, also testified that the creation of price zones is a collaborative

4  process that involves the knowledge, input and expertise of a variety of

5  contributors.[79]

6

7      41.    Schrader's price zone were at odds with the zones which the

8  individual plaintiffs alleged in their Complaint.[80]   The plaintiffs also testified at trial

9  concerning their views on the competition they face.   Schrader testified that in

10  formulating price zones for plaintiffs, he did not consider plaintiffs' own views of

11  their competitive areas.[81]

12

13      42.    Specifically, Ray Elahinia, plaintiff Ashkan's principal, testified

14  that he looks at stations within one or two miles from Ashkan's station when setting

15  Ashkan's retail prices, and that he regularly monitors the prices at only those

16  stations that are within one mile.[82]   Elahina also testified that he considers plaintiff

17  Ashkan's immediate competition to be the stations within one mile of it.[83]   The price

18  zone that Schrader created for plaintiff Ashkan is approximately 91 square miles

19  and contains approximately 153 total stations, virtually the whole San Fernando

20

21

22

23

24  ───────────────

      [78]  June 19, 2007, Vol. 1 at 35:4-36:12.

25    [79]  May 30, 2007, Vol. 1 at 65:18-66:19; May 31, 2007 at 53:13-54:1; June 12,

26  2007, Vol. 1 at 44:7-45:12, 47:23-49:21; June 19, 2007, Vol. 2 at 34:24-35:18.

      [80]  Third Amended Complaint, ¶ 122.

27    [81]  June 19, 2007, Vol. 1 at 16:24-17:5.

28    [82]  June 7, 2007, Vol. 2 at 88:12-18, 91:13-18.

      [83]  June 7, 2007, Vol. 2 at 92:17-23; June 19, 2007, Vol. 1 at 19:8-20:19.

Valley.[84] The zone of competition that plaintiff Ashkan alleged in its complaint is significantly smaller than the price zone that Schrader created for plaintiff Ashkan.[85]

43.    Plaintiff Wong testified that he considers stations within a one mile radius to be his competitors.[86] Wong does not believe that two of the stations he owns in San Francisco, which are approximately two miles apart, compete with each other for sales of motor fuel because they are "too far from each other" and "[p]eople don't go that far" to shop for gasoline.[87] The price zone that Schrader created for plaintiff Wong is approximately 55 square miles and contains 97 total stations.[88] The area of competition that plaintiff Wong alleged in his complaint is significantly smaller than the price zone that Schrader created for plaintiff Wong.[89]

44.    Shahin Etaladju, plaintiff Alborz's principal, considers the five stations within 2 miles of his station to be his competitors.[90] The price zone that Schrader created for plaintiff Alborz is 22 square miles and includes 39 total stations.[91] The area of competition that plaintiff Alborz alleged in its complaint is significantly smaller than the price zone that Schrader created for plaintiff Alborz.[92]

---

[84] June 19, 2007, Vol. 1 at 18:11-19:4; June 20, 2007, Vol. 2 at 36:4-9; Exhibit 1006 (as annotated by witnesses during trial).

[85] June 19, 2007, Vol. 1 at 17-:12-18:10; Trial Exhibit 1006 (as annotated by witnesses during trial); Third Amended Complaint, ¶ 122(h).

[86] June 6, 2007, Vol. 2 at 55:11-15, 61:11-16.

[87] June 6, 2007, Vol. 2 at 59:17-60:4 (referencing Wong's deposition testimony that was played by video during trial).

[88] June 19, 2007, Vol. 1 at 22:7-16; June 20, 2007, Vol. 2 at 37:2-8.

[89] June 19, 2007, Vol. 1 at 22:3-6; Third Amended Complaint, ¶ 122(m).

[90] June 7, 2007, Vol. 2 at 29:8-30:6.

[91] June 20, 2007, Vol. 2 at 35:8-22.

[92] June 7, 2007, Vol. 2 at 32:8-36:4, 96:1-8; June 19, 2007, Vol. 1 at 23:3-22; Exhibit 1005; Third Amended Complaint, ¶ 122(f).

45.     Plaintiff Kim considers stations within one mile of his station to be his competitors.[93]  The price zone that Schrader created for plaintiff Kim contains 38 stations and covers 22 square miles.[94]

46.     Jamal Anaim, plaintiff Saban's principal, considers the two stations within a quarter mile of his station to be his direct competitors.[95]  The price zone that Schrader created for plaintiff Saban includes 66 stations and covers 47 square miles.[96]

47.     The price zone that Schrader created for plaintiff Madani also does not correspond with plaintiff Madani's own views on his competition.[97]

48.     Equilon's expert Professor Joseph Kalt offered valid criticism of Schrader's price zones accurately reflect the plaintiffs' competitive environments.  He was well credentialed,[98] and Kalt has substantial experience analyzing the economics of the oil industry, including gasoline marketing, pricing and competition.[99]

49.     To determine whether Schrader's price zones accurately reflect the plaintiffs' competitive environments, Kalt analyzed the retail prices charged by

---

[93] June 7, 2007, Vol. 1 at 25:21-26:14.
[94] June 20, 2007, Vol. 2 at 36:10-22.
[95] June 7, 2007, Sealed Transcript at 9:18-11:5.
[96] June 20, 2007, Vol. 2 at 36:23-37:2.
[97] June 19, 2007, Vol. 1 at 24:24-25:9; compare Exhibit 1047 with Third Amended Complaint , ¶ 122(j).
[98] June 20, 2007, Vol. 1 at 70:16-71:4.
[99] June 20, 2007, Vol. 1 at 71:25-81:14.

the non-Equilon stations in Schrader's price zones.[100]  Kalt's premise for that analysis was that if all the stations included in Schrader's price zones did indeed engage in substantial competition with each other, as Schrader concluded, then their retail prices would tend "to get mushed together," because retail price differences between those competing stations would not be sustainable.[101]  On the other hand, evidence of sustained retail price differences between non-Equilon stations located in different areas of Schrader's price zones would indicate that Schrader's price zones include stations that do not engage in substantial competition with each other.[102]

50.    Kalt concluded that the non-Equilon stations located closest to the alleged "favored" Equilon stations in Schrader's price zones (that allegedly received lower DTW prices than plaintiffs) were systematically charging lower retail prices than the non-Equilon stations located closest to the plaintiffs' stations.[103]  Those retail price disparities demonstrate that the non-Equilon stations located in Schrader's price zones are "facing different competitive environments," and "are not in substantial competition with each other."[104]

51.    Kalt concluded that the significant and sustained retail price disparities that he observed within Schrader's price zones confirm that those price zones are "too large to capture the substantial competition that actually drives not just the plaintiffs" but also their non-Equilon competitors.[105]

---

[100]  June 20, 2007, Vol. 2 at 21:7-34:13.
[101]  June 20, 2007, Vol. 2 at 22:16-24:4, 29:13-21.
[102]  June 20, 2007, Vol. 2 at 22:16-24:4.
[103]  June 20, 2007, Vol. 2 at 24:21-25:5, 26:21-27:17, 28:5-29:23, 30:14-34:13.
[104]  June 29, 2007, Vol. 2 at 25:1-5, 27:4-11.
[105]  June 20, 2007, Vol. 1 at 64:3-15; Vol. 2 at 22:2-27:17; Vol. 2 at
(continued...)

-19-

52. It is worth noting that Kalt's analysis of prices charged by non-Equilon dealers, which were generally lower, was not offered in support of a meeting-competition defense. Rather his point was that supposedly competing Equilon dealers in different pricing zone are not in the same competitive environment. The varying prices among non-Equilon dealers are simply indicia of that fact.

53. Kalt also points to the anti-competitive effects which flow from Schrader's large price zones because a uniform price over a larger zone would "handcuff[]" dealers facing localized aggressive competition.[106] Absent a DTW price determined in light of their immediate competition, such dealers–and hence consumers–would be disadvantaged.

54. After weighing the evidence, the Court finds that the evidence weighs in favor of the conclusion that Equilon's price zones for the plaintiffs accurately reflect their competition. Conversely, plaintiffs have not carried their burden through Schrader or otherwise to demonstrate that Equilon's price zone are unreasonable and result in discrimination among competing Equilon dealers.

55. Specifically, plaintiff Saban's Equilon-defined price zone accurately reflects Saban's significant competition from other Equilon dealers.[107]

---

[105] (...continued)
30:22-31:10, 37:9-38:4.
[106] June 20, 2007, Vol. 2 at 33:6-22.
[107] Exhibit 1031; May 30, 2007, Vol. 2 at 4:16-5:14.

56.    Plaintiff Kim's Equilon price zone accurately reflects Kim's significant competition from other Equilon dealers.[108]

57.    Plaintiff Ashkan's Equilon price zone accurately reflects Ashkan's significant competition from other Equilon dealers.[109]

58.    Plaintiff Wong's Equilon price zone accurately reflects Wong's significant competition from other Equilon dealers.[110]

59.    Plaintiff Alborz's Equilon price zone accurately reflects Alborz's significant competition from other Equilon dealers.[111]

60.    Plaintiff Madani's Equilon price zone accurately reflects Madani's significant competition from other Equilon dealers.[112]

61.    It is undisputed that Equilon charges each dealer in the same Equilon price zone the same DTW price for gasoline every day.[113]  Accordingly, the Court finds that Equilon charges the same DTW prices for motor fuel to all its dealers who engage in significant competition with each other.

Absence of Significant DTW Price Differentials.

---

[108]  <u>See</u> Exhibit 1028; May 30, 2007, Vol. 2 at 5:21-6:2.
[109]  <u>See</u> Exhibit 1027; May 30, 2007, Vol. 2 at 6:11-7:1.
[110]  <u>See</u> Exhibit 1032; May 30, 2007, Vol. 2 at 9:20-10:8.
[111]  <u>See</u> Exhibit 1026; May 30, 2007, Vol. 2 at 10:13-11:2.
[112]  <u>See</u> Exhibit 1029; May 30, 2007, Vol. 1 at 94:19-96:6.
[113]  Stipulated Facts at 4; June 5, 2007, Vol. 1 at 88:19-89:3; June 5, 2007, Vol. 2 at 70:20-71:3; June 12, 2007, Vol. 1 at 60:24-61:4.

62.    Equilon's expert witnesses Kalt and John Umbeck conducted a number of tests to determine whether plaintiffs were charged higher DTW prices than Equilon dealers outside their Equilon price zones.  Like Kalt, Umbeck is a well credentialed,[114] specializing in industrial organization, and has substantial experience analyzing the economics of the petroleum industry.[115]

63.    Based on a the DTW prices charged to plaintiffs and to all other Equilon stations in each of their Schrader-defined zones,[116]  Kalt concluded that plaintiffs' DTW prices, over time, were reasonably consistent with all other Equilon dealers in their Schrader zones, and that the prices do not evidence systematic price discrimination.[117]

64.    Exhibits 1057-1089 show the average annual DTW prices charged to all Equilon stations located within Schrader's price zones during the relevant time period.[118]  Those exhibits show that where there were any DTW price differences between Equilon dealers in Schrader's price zones, those differences typically were only 1-2 cents.[119]

65.    Taking two miles as an industry benchmark for stations to engage in significant competition with each other, Umbeck analyzed whether plaintiffs were charged higher DTW prices than any other dealers within 2 miles of their respective stations (regardless of whether those other stations are included in

---

[114]  June 19, 2007, Vol. 2 at 103:1-109:13.
[115]  June 19, 2007, Vol. 2 at 104:6-119:20.
[116]  June 20, 2007, Vol. 2 at 47:18-51:17; Exhibit 825 (Alborz); Exhibit 826 (Ashkan); Exhibit 828 (Kim); Exhibit 829 (Madani); Exhibit 831 (Saban); Exhibit 832 (Wong).
[117]  See note 116.
[118]  Exhibits 1057-1089.
[119]  Id.; June 5, 2007, Vol. 2 at 46:25-52:14.

plaintiffs' Equilon or Schrader-defined price zones).[120]  Umbeck concluded that in

most cases, the average annual DTW price difference between plaintiffs and the

various Equilon stations within two miles of their stations was zero.[121]  In many

other cases, the plaintiffs paid lower average annual DTW prices than the other

Equilon stations within two miles of their stations.[122]

66.  Kalt compared the DTW prices received by plaintiffs and by each

of the Equilon stations in their Schrader price zones that plaintiffs' damages expert,

Michaels, identified as "favored" stations that received lower DTW prices than

plaintiffs.[123]  Kalt concluded that, in general, plaintiffs were "favored" (received

lower DTW prices than the competitor) often to the same extent if not more than

they were "disfavored" (received higher DTW prices).[124]

67.  For example, Kalt concluded that, on average, plaintiff Kim

received a more favorable DTW price than the purportedly favored competitors in

his Schrader-defined zone 77% of the time.[125]  Plaintiff Alborz received a more

favorable price 72% of the time.[126]  Professor Kalt concluded that plaintiff Saban

benefitted from DTW price differentials 59% of the time.[127]  Plaintiff Wong was

either favored or received the same price as his purported competitors more than

half the time.[128]  Plaintiff Madani's prices were "basically equal" to his purported

---

[120]  June 20, 2007, Vol. 1 at 23:9-25:11; Exhibit 650.
[121]  June 20, 2007, Vol. 1 at 25:8-11; Exhibit 650.
[122]  June 20, 2007, Vol. 1 at 24:20-25:5; Exhibit 650.
[123]  June 20, 2007, Vol. 2 at 51:20-53:8.
[124]  June 20, 2007, Vol. 2 at 53:18-57:2; Exhibit 842.
[125]  June 20, 2007, Vol. 2 at 54:10-16; Exhibit 842.
[126]  June 20, 2007, Vol. 2 at 53:1-13; Exhibit 842.
[127]  June 20, 2007, Vol. 2 at 55:1-5; Exhibit 842.
[128]  June 20, 2007, Vol. 2 at 55:6-11; Exhibit 842.

1 | competitor's price, and he was favored more often than not; there was no "pattern
2 | of discrimination."[129]

3

4 |     68.    The only plaintiff that Kalt concluded received a higher DTW
5 | price than his purportedly favored competitor more often than not is plaintiff
6 | Ashkan, but there was a market explanation.[130] The distant competitor (from a
7 | neighboring Equilon price zone) was faced with competitors such as 76 and Unocal
8 | stations that tended to offer lower retail prices, which necessitated Equilon charging
9 | lower DTW prices to that Equilon dealer to allow it to compete with its localized
10 | competition.[131]

11

12 |     69.    Based on the foregoing, the Court finds that plaintiffs failed to
13 | show significant DTW price differences over time between their stations and other
14 | Equilon dealers with which they claim to compete.

15

16 | <u>Absence of Competitive Injury</u>

17

18 |     70.    Plaintiffs did not introduce any admissible evidence of harm to
19 | competition generally in the market for motor fuel.  Rather, plaintiffs sought to
20 | show injury to competition by establishing that they lost gasoline sales as a result of
21 | Equilon's alleged price discrimination, and that the alleged "favored" dealers gained
22 | sales.  To make those showings, plaintiffs relied on the testimony and analysis of
23 | their damages expert, Robert Michaels.

24

25

26

27 | [129] June 20, 2007, Vol. 2 at 54:17-25; Exhibit 842.
28 | [130] June 20, 2007, Vol. 2 at 52:8-53:13.
    [131] June 20, 2007, Vol. 2 at 56:1-10.

71.   On June 26, 2007, after the completion of several days of Michaels' testimony, the Court granted Equilon's Motion to Strike the entirety of Michaels' testimony and supporting exhibits. For the following reasons, the Court disregards that evidence for purposes of evaluating plaintiffs' request for injunctive relief. The Court recited at length its reasons for rejecting Michaels' testimony,[132] and only summarizes those reasons here.[133]

72.   To conduct his analysis, Michaels "accepted Mr. Schrader's market definitions," and compared the DTW prices that plaintiffs and the other Equilon dealers in Schrader's price zones received.[134] He then ran "regression" tests to examine the relationship between plaintiffs' volumes and the DTW prices charged to plaintiffs and to other Shell stations located in plaintiffs' Schrader-defined zones.[135] The Court finds that Michaels' regression analysis is unreliable for several reasons.

---

[132]   June 26, 2007, Vol. 2 at 106-09, Vol. 2 at 4-8.

[133]   There were also material flaws in Michael's damage analysis. Among other things, to reach a damages figure based on plaintiffs' alleged lost sales, Michaels multiplied plaintiffs' alleged total lost gallons by the "estimated industry margin" ("EIM") (June 13, 2007, Vol. 2 at 27:25-28:18, 29:23-30:3), Michaels testified that he used EIMs for each plaintiff even though those margins are not necessarily the actual margins the dealers were making." (June 13, 2007, Vol. 2 at 28:19-25.) He also used the same margin for each plaintiff for the entire damages period (June 13, 2007, Vol. 2 at 29:1-10), even though plaintiffs uniformly testified that their margins fluctuate over time. (June 7, 2007, Vol. 2 at 79:7-80:3 (Ashkan's margins fluctuate); June 6, 2007, Vol. 2 at 44:18-45:8 (Wong's margins fluctuate); June 7, 2007, Vol. 2 at 44:6-24, 45:25-46:9 (Alborz's margins fluctuate); June 7, 2007, Vol. 1 at 27:6-28:23 (Kim's margins fluctuate); June 7, 2007, Vol. 1 at 87:3-9; Vol. 2 at 13:1-5, 13:24-15:21 (Saban's margins fluctuate); June 6, 2007, Vol. 1 at 52:24-53:2, 56:6-20, 82:8-15 (Madani's margins fluctuate).) The Court finds that Michaels' use of the EIM renders his conclusions that plaintiffs were damaged inaccurate.

[134]   June 12, 2007, Vol. 2 at 35:3-17.

[135]   June 12, 2007, Vol. 2 at 50:6-23.

73.     First, Michaels' regressions control for only two factors: (1) DTW price "gaps" between plaintiffs and the alleged "favored" Equilon dealers; and (2) plaintiffs' total monthly gasoline volumes.[136]  Michaels did not consider the effects on gasoline sales of any other factors.  The failure to control for other factors that may affect volumes renders his regression analysis unreliable.

74.     Second,  Michaels did not consider the retail prices charged by plaintiffs and by the alleged favored competitors.[137]  Michaels testified that he was instructed by plaintiffs' counsel not to "worry about" retail prices.[138]  Michaels admitted that the "ideal, the best" way to determine the cause of volume changes at the plaintiffs' stations is to analyze the effect of the retail prices charged at plaintiffs' and their competitors' stations.[139]  He also admitted that retail prices, and not DTW prices, are what cause a consumer to choose to buy gas at a particular station.[140]

75.     Third, Michaels assumption that all dealers' retail prices bear a "reasonably stable relationship"[141] with their DTW prices was not reasonable. Michaels admitted that his analysis is "unreliable" where either the plaintiff or the alleged competitor's DTW price did not bear a reasonably stable relationship with

---

[136]  June 13, 2007, Vol. 1 at 79:4-14.
[137]  June 12, 2007, Vol. 2 at 88:13-15, 89:6-90:1; June 13, 2007, Vol. 1 at 48:5-21, 70:25-71:8.
[138]  June 15, 2007, Vol. 1 at 23:13-24:15.
[139]  June 13, 2007, Vol. 1 at 54:2-10, 69:20-70:6.
[140]  June 13, 2007, Vol. 1 at 52:19-22, 53:13-25.
[141]  June 14, 2007, Vol. 1 at 44:25-45:10.

its street prices.[142]  Michaels did not test or verify whether there actually is any such reasonably stable relationship.[143]

76.     The evidence shows that there is no "reasonably stable relationship" between plaintiffs' or the alleged favored dealers' DTW prices and street prices.  Each plaintiff testified that his margins fluctuate over time.[144]  Pricing data analyzed by Equilon's experts also show that there is no reasonably stable relationship between DTW and retail prices at plaintiffs' or the alleged favored dealers' stations.[145]  In light of this data, Michaels admitted that there is no "reasonably stable relationship" between DTW price gaps and retail price gaps at plaintiffs' and their competitors' stations.[146]  Accordingly, the Court finds that DTW prices are an unreliable surrogate for retail prices.

77.     Fourth, Michaels failed to consider whether the volume changes he identified were caused, at least in part, by any other potentially significant factors.[147]  Even though plaintiffs testified that they compete with nearby non-Equilon stations, Michaels did not consider the retail prices charged by

---

[142]  June 14, 2007, Vol. 1 at 45:11-50:11; June 15, 2007, Vol. 1 at 6:1-7:11.
[143]  June 15, 2007, Vol. 1 at 9:11:16, 21:5-22:20.
[144]  June 7, 2007, Vol. 2 at 79:7-80:3 (Ashkan's margins fluctuate); June 6, 2007, Vol. 2, at 44:18-45:8 (Wong's margins fluctuate); June 7, 2007, Vol. 2 at 44:6-24, 45:25-46:9 (Alborz's margins fluctuate); June 7, 2007, Vol. 1, at 27:6-28:23 (Kim's margins fluctuate); June 7, 2007, Vol. 1, at 87:3-9; Vol. 2 at 13:1-5, 13:24-15:21 (Saban's margins fluctuate); June 6, 2007, Vol. 1 at 52:24-53:2, 56:6-20, 82:8-82:15 (Madani's margins fluctuate).
[145]  June 26, 2007, Vol. 1 at 104:15-107:1; Exhibits 428 (Alborz); 429 (Ashkan); 431 ( Kim); 432 (Madani); 434 (Saban); 435 (Wong); 1336-1343, 1345-1353, 1355-1357; 1127 (Alborz); 1131 (Madani); 1133 (Saban); 1137 (Kim); 1140 (Alborz); 1144 (Ashkan); 1159 (Madani); 1152 (Saban); and 1164 (Wong).
[146]  June 15, 2007, Vol. 1, at 18:9-21:4.
[147]  June 13, 2006, Vol. 1 at 65:3-66:11, 79:15:80:2, 89:2-7.

plaintiffs' closest non-Equilon competitors.[148]  Michaels also did not consider the effects on plaintiffs' and their competitors' volumes of temporary station closures, changing traffic patterns, openings/closings of other stations, and other "local" factors related to the areas in which the stations he studied are located.[149]  The Court finds that Michaels failure to account for other variables that may have affected plaintiffs' and their competitors' volumes renders his lost-sales analysis unreliable.

78.    Fifth, the confidence level used in evaluating whether DTW price differences were related to volume changes at the plaintiffs' stations, a 20% acceptance factor, was both unreasonable and professionally unsound.[150]  The "generally accepted" rates in the economic community of 5-10%,[151] and before conducting his work for plaintiffs in this case, he had never used an acceptance factor other than 5-10%.[152]  Michael also testified that "no reputable economic journal" would adopt a 20% acceptance factor to determine significant levels for the type of regression analysis that he conducted.[153]  Indeed, he described the such work as pioneering: "This is the first time I have ever seen any analysis of this type of any kind."[154]  This is a sufficient basis for rejecting the entirety of Michaels under Rule 702 of the Federal Rules of Evidence and Daubert.[155]

---

[148]  June 13, 2007, Vol. 1 at 80:20-81:16; June 20, 2007, Vol. 2 at 17:15-18:12.

[149]  June 13, 2006, Vol. 1 at 65:3-66:11, 79:15:80:2, 89:2-7.

[150]  June 15, 2007, Vol. 1 at 79:24-81:2.

[151]  June 15, 2007, Vol. 1 at 80:20-81:6.

[152]  June 15, 2007, Vol. 1 at 80:24-81:2.

[153]  June 26, 2007, Vol. 1 at 36:9-19.

[154]  June 26, 2007, Vol. 1 at 38:3-4.

[155]  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589-92 (1993); Daubert v. Merrell Dow Pharmaceuticals., Inc., 43 F.3d 1311, 1319-20 (9th Cir. 1995).

79.     Sixth, the shrinking focus of Michaels work undermines its credibility.  He initially identified 56 "favored dealers" who had lower DTW prices than plaintiffs and, according to his economic model, should have gained volumes that plaintiffs lost.[156]  In the end, however, he found that only 8 of those 56 purportedly favored stations showed correlated volume gains.[157]

80.     Seventh, Michaels was unfairly selective in his choice of data. In running his regressions,  Michaels considered the effects of the DTW price differences (or the "gaps") on plaintiffs' volumes only in months in which the gaps were positive (meaning the plaintiff was charged on average a higher DTW price than a competitor), but not in negative months,[158] despite the fact that many plaintiffs actually received lower DTW prices on average than their alleged competitors in many months during the damages period.[159]

81.     Eighth,  Michaels did not consider updated pricing data for the period between June 2006 and March 2007[160]

82.     In light of the foregoing flaws in Michaels' methodology and results, the Court finds that Michaels' conclusions that plaintiffs lost sales as a result of Equilon's price discrimination are unreliable.

---

[156]  June 13, 2007, Vol. 1 at 82:24-83:6.
[157]  June 13, 2007, Vol. 2 at 11:19-12:5, 68:23-69:25.
[158]  June 14, 2007, Vol. 1 at 27:6-17.
[159]  June 14, 2007, Vol. 1 at 27:18-22; see ¶¶ 62-69, supra.
[160]  June 13, 2007, Vol. 2 at 57:8-13; June 14, 2007, Vol. 1 at 20:5-18; compare Exhibit 1097 (Michaels' table 2a identifying 8 competitors that gained volumes), with Trial Exhibit 1304 (analysis prepared by Equilon's experts using updated pricing data, and identifying only 6 competitors that gained volumes). Michaels testified that Equilon's experts' results are accurate. June 13, 2007, Vol. 2 at 58:15-23.

83.     The Court also finds that plaintiffs' evidence is insufficient to show that "favored" dealers gained sales when plaintiffs lost sales. Michaels did not even identify customer transfers between stations or "examine movement of specific customers."[161] He also admitted that he does not know where plaintiffs' claimed lost volumes go "because there is such a dispersion in where exactly [plaintiffs' customers] go."[162] Michaels acknowledged that plaintiffs' alleged lost volumes likely "went to competitors of all sorts. Some of them went to other brands. They went to Chevron. They went to Arco. They went to Unocal, and some went to other Shell stations as well."[163]

84.     Plaintiffs themselves testified that they do not know of other Equilon dealers that gained sales when they allegedly lost sales.[164] Plaintiffs also testified that they believe their lost sales are gained by a variety of stations, including nearby non-Equilon competitors. For example, Shahin Edalatdju, for plaintiff Alborz, testified that he believes he loses volumes to an Arco on the "other side of the freeway."[165] Plaintiff Kim believes he lost business to a 76 station across the street from his station.[166]

85.     Plaintiffs also did not introduce any admissible evidence that any competing Equilon dealer "knowingly received" lower DTW prices than they

---

[161] June 13, 2007, Vol. 1 at 77:7-13, 100:1-5.

[162] June 13, 2007, Vol. 1 at 102:7-8.

[163] June 13, 2007, Vol. 1 at 18:21-19:1.

[164] June 6, 2007, Vol. 1 at 78:2-17, 79:6-9, 111:21-112:1; June 6, 2007, Vol. 2 at 67:9-12; June 7, 2007, Vol. 2 at 12:2-6, 48:7-49:5. Although Shahin Etaladju, plaintiff Alborz's principal, testified that Alborz lost sales to a specified competing Shell station, that station is in Alborz's Equilon price zone and always receives the same DTW price as Alborz. June 7, 2007, Vol. 2 at 46:14-47:18.

[165] June 7, 2007, Vol. 2 at 46:10-13.

[166] June 7, 2007, Vol. 1 at 26:25-27:5.

1  did.  Thus, the Court finds that the weight of the evidence does not support the

2  conclusion that any plaintiff's ability to compete with "favored" Equilon dealers

3  was injured, lessened or destroyed by Equilon's alleged price discrimination.

4

5  <u>Absence of Proof on Injury Stemming from Price Discrimination</u>

6

7      86.      Because of the unreliability of Michaels' analysis, the evidence

8  does not support a finding that plaintiffs lost sales or were otherwise injured as a

9  result of Equilon's alleged price discrimination.

10

11     87.      Even if Michaels' results were acceptable, those results confirm

12 that plaintiffs Saban and Alborz suffered no losses as a result of Equilon's alleged

13 price discrimination.  Michaels confirmed that Alborz was not harmed: "Alborz in

14 fact did not suffer volume losses.  Mr. [sic] Alborz -- the equation simply did not

15 show any such volume of debts for him."[167]

16

17     88.      Prior to trial, Michaels updated his damages analysis to

18 incorporate updated pricing data for the period from approximately June 2006

19 through March 2007.[168]  When plaintiff Saban's losses are calculated using the

20 updated data, "Saban's regression comes out owing him no damages."[169]

21

22     89.      In general, the evidence shows that plaintiffs' volumes,

23 revenues, margins and profitability have risen over time.[170]  For example, plaintiff

24

25  _____

26  [167]  June 13, 2007, Vol. 1 at 20:11-16; Exhibit 1098.

    [168]  June 13, 2007, Vol. 2 at 37:8-38:10.

27  [169]  June 13, 2007, Vol. 2 at 47:3-4, 48:1-5.

    [170]  June 20, 2007, Vol. 2 at 66:24-68:9; Exhibits 759, 760, 763, 764, 766 and

28  767.

Madani's profits increased between 2000 and 2005.[171]  Plaintiff Kim's volumes increased between 1998 and 2005.[172]  Plaintiff Ashkan's net income increased every year since 2000.[173]  Plaintiff Alborz's volume has increased on average by 589 gallons per month between 1998 and 2006, and plaintiffs Kim, Madani and Saban have each had average monthly volume increases of more than 360 gallons.[174]  All plaintiffs have had average monthly increases in gross revenues since 1998.[175]  That plaintiffs prospered does not, of course, mean that they would not have prospered more if there had in fact been price discrimination.

90.     Accordingly, the Court finds that plaintiffs failed to prove that their businesses have been injured due to DTW price differences.

II.     Conclusions of Law.

Liability under Business and Profession Code §§ 21200 and 17200

1.  The Court has jurisdiction over the claims asserted by plaintiffs. 28 U.S.C. § 1332(a).

2.  To prove that Equilon violated California Business & Professions Code § 21200, each plaintiff must establish the following by a preponderance of the evidence:

---

[171] June 6, 2007, Vol. 1 at 108:15-109:7.
[172] June 7, 2007, Vol. 1 at 33:24-34:15.
[173] June 7, 2007, Vol. 2 at 76:25-78:23.
[174] June 20, 2007, Vol. 2 at 67:8-24; Exhibit 759.
[175] Exhibit 759.

a.  That Equilon charged different prices for motor fuel to dealers with which the plaintiff competes;

b.  That the effect of Equilon charging different prices to motor fuel dealers with which the plaintiff competes is to lessen competition generally in the market for motor fuel, or to injure, destroy or prevent competition between the plaintiff and a favored dealer who knowingly receives the benefit of such discrimination; and

c. That the plaintiff's business was injured because of the discriminatory pricing.

Cal. Bus. & Prof. Code § 21200.

3.  Plaintiffs' claims under California Business & Professions Code § 17200 are subject to the same proof as their claims under Section 21200.  E.g., Kentmaster Mfg. Co. v. Jarvis Products Corp., 146 F.3d 691, 695 (9th Cir. 1998), amended 164 F.3d 1243 (9th Cir. 1999) (where plaintiff fails to state an antitrust claim, a Section 17200 claim based on the same allegations also fails as a matter of law); Carter v. Variflex, Inc., 101 F.Supp. 2d 1261, 1270 (C.D. Cal. 2000); see California Medical Ass'n v. Aetna U.S. Healthcare of California, Inc. 94 Cal. App. 4th 151, 169-70 (2001); Minute Order, May 15, 2007, Docket No. 337,  p. 17 .

4.  The Court concludes that plaintiffs failed to establish liability against Equilon on their claims under California Business & Professions Code §§ 17200 and 21200.

A.    Substantial Competition.

1          5.  For purposes of Section 21200, two stations "compete" with each

2  other only if they engage in substantial, rather than minimal, competition with each

3  other.   Lewis v. Philip Morris Inc., 355 F.3d 515, 533 (6th Cir. 2004) ("sellers or

4  producers who have actual or potential ability to deprive each other of significant

5  levels of business"); Universal-Rundle Corp. v. F.T.C., 382 F.2d 285, 287 (7th Cir.

6  1967) (the evidence must show a substantial degree of existing as opposed to

7  minimal or sporadic competition).

8

9          6.  Section 21200 is concerned with price differentials whose effect

10  "is to lessen competition, or to injure, destroy, or prevent competition" in the

11  market for motor fuel or between the plaintiff and a competing dealer who

12  knowingly received the benefit of the price differentials.  Cal. Bus. & Prof. Code

13  § 21200; Falls City Industries, Inc. v. Vanco Beverage, Inc., 460 U.S. 428, 435

14  (1983) (price discrimination must occur over time); Hasbrouck v. Texaco, Inc., 842

15  F.2d 1034, 1041 (9th Cir. 1987) ("a substantial price discrimination [must] exist[]

16  as between himself and his competitors over a period of time").  Thus, sporadic or

17  minimal price differences over time are not actionable under Section 21200,

18  because, in such circumstances, there is no injury to competition.

19

20          7.  Plaintiffs failed to prove that Equilon charged different prices for

21  motor fuel to dealers with which they engage in substantial competition.

22

23         B.  Injury to Competition.

24

25          8.  "A hallmark of the requisite competitive injury . . is the diversion of

26  sales or profits from a disfavored purchaser to a favored purchaser." Volvo

27  Trucks North America, Inc.  v. Reeder-Simco GMC, Inc., 546 U.S. 164, 177

28

1   (2006) (citing F.T.C. v. Sun Oil Co., 371 U.S. 505, 518-519 (1963)); Falls City

2   Industries, 460 U.S. at 437-438.

4           9.   The requirement that a Section 21200 plaintiff must show injury

5   between it and a favored dealer also recognizes the fundamental maxim of antitrust

6   law that the focus of the inquiry is injury to competition.  Cargill, Inc. v. Monfort of

7   Colorado, Inc., 479 U.S. 104, 115 (1986); Brown Shoe Co. v. United States, 370

8   U.S. 294, 320 (1962); Cel-Tech Communications, Inc. v. Los Angeles Cellular

9   Telephone Co., 20 Cal. 4th at 163, 186 (1999) (injury to a competitor not equivalent

10  to injury to competition).

12          10.  Thus, to establish the requisite competitive injury, plaintiffs must

13  prove not only that they lost sales, but also that the alleged "favored" stations

14  gained sales when plaintiffs lost sales.   Volvo Trucks, 546 U.S. at 177;

15  Alexander v. The Texas Company, 165 F. Supp. 53, 58  (W.D. La. 1958); see also

16  Hasbrouck, 842 F.2d at 1042.

18          11.  Plaintiffs failed to prove that the effect of Equilon charging

19  different prices to alleged "favored" dealers is to lessen competition generally in the

20  market for motor fuel, or to injure, destroy or prevent competition between them

21  and a favored dealer who knowingly received the benefit of such lower prices.  For

22  purposes of injunctive relief, the Court acknowledges that plaintiffs need not prove

23  harm to them if they establish potential harm to competition generally.  Falls City

24  Industries, 460 U.S. at 434-35.

26          12.  Even if the Court accepted Stephen Schrader's opinion that

27  plaintiffs engaged in substantial competition with Equilon dealers outside their

28  Equilon price zones, and that those dealers were charged substantially different

1  DTW prices over time, evidence of DTW price differences between competing

2  dealers, without more, is inadequate to state a <u>prima facie</u> case under

3  Section 21200.  <u>Cal. Bus. & Prof. Code</u> § 21200.[176]

4

5                    C.      <u>Injury to Business.</u>

6

7             13.  To establish that their businesses were injured because of the

8  allegedly discriminatory conduct, plaintiffs must prove that (1) they incurred lost

9  sales or profits; and (2) Equilon's price discrimination, as opposed to other

10  factors, was a material cause of their lost sales or lost profits. <u>Hasbrouck</u>, 842 F.2d

11  at 1041-42;  <u>Falls City Industries</u>, 460 U.S. at 435 (a showing of antitrust injury

12  from price discrimination requires "direct evidence of displaced sales" or "lost

13  sales or profits").

14

15            14.  To establish that Equilon's alleged price discrimination was a

16  material cause of their alleged losses, plaintiffs must show that the favored dealers

17  passed on the lower DTW prices they received to consumers.  If the favored

18  dealers maintained their retail prices and simply enjoyed higher margins and profits,

19  plaintiffs could not have lost sales to them "because of" DTW price differentials.

20  <u>J. Truett Payne Co., Inc. v. Chrysler Motors Corp.</u>, 451 U.S. 557, 564 n.4 (1981)

21  ("the inability of petitioner to show that the favored retailers lowered their retail

22  prices makes petitioner's argument particularly weak"); <u>American Booksellers</u>

23  <u>Ass'n v. Barnes & Noble, Inc</u>, 135 F. Supp. 2d 1031, 1040 (N.D. Cal. 2001)

24  (failure to show favored dealer passed on discounts negates showing of harm to

25  plaintiff).

26

27

28

          [176]  June 26, 2007, Vol. 2 at 5:15-25, 8:4-19.

15.  Plaintiffs failed to prove that their businesses were injured because of wholesale price differentials.  In addition, plaintiffs failed to show that Equilon's alleged price discrimination was a material cause of those losses.

16.  Because plaintiffs have failed to prove a <u>prima facie</u> case, the Court need no consider Equilon's affirmative defenses, including meeting competition.  Cal. Bus. & Prof. Code § 21200.

<u>Injunctive Relief</u>

17.  Injunctive relief is available under each of plaintiffs' statutory claims.  Cal. Bus. & Prof. Code §§ 17203, 21200.

18.  Any grant of a permanent injunction relief requires "actual success on the merits.  <u>Walters v. Reno</u>, 145 F.3d 1032, 1048 (9th Cir. 1998); <u>accord</u> <u>Amoco Prod. Co. v. Village of Gamble</u>, 480 U.S. 531, 546 n.12 (1987); <u>Art Movers. Inc. v. Ni West, Inc.</u>, 3 Cal. App. 4th 640, 646 (1992) ("A permanent injunction is a determination on the merits") .

19.  Plaintiffs also must prove (1) a likelihood of substantial and immediate irreparable injury; (2) the inadequacy of monetary damages; (3) that the balance of equities favors injunctive relief; and (4) that the public interest would be served by injunctive relief.   <u>High Sierra Hikers Ass'n v. Blackwell</u>, 390 F.3d 630, 641-42 (9th Cir. 2004);  <u>LaDuke v. Nelson</u>, 762 F.2d 1318, 1330 (9th Cir. 1985); <u>Walters</u>, 145 F.3d at 1048.

20.  Plaintiffs' claims under Section 21200 and Section 17200 fail as a matter of law.[177]  Because plaintiffs failed to achieve success on the merits of their claims, plaintiffs are unable as a matter of law to obtain a permanent injunction against Equilon.  See, e.g., Walters, 145 F.3d at 1048.  The Court need not address the remaining element for injunctive relief.[178]

21.  Separately, the Court finds that there is no practical, objective and consistent way to implement larger price zones under Stephen Schrader's methodology, and that plaintiffs have identified no other methodology for altering the sizes of their price zones.[179]  Courts are ill-equipped to engage in what inevitably would require on-going micro-management of complex business affairs.  National Resources Defense Council, Inc. v. U.S. E.P.A., 966 F.2d 1292, 1300 (9th Cir. 1992) ("Injunctive relief may be inappropriate where it requires constant supervision"); Desert Healthcare Dist. v. PacifiCare FHP, Inc., 94 Cal. App. 4th 781, 796 (2001) (supervision of injunction in health care field "would pull the court deep into the thicket of the health care finance industry, an economic arena that courts are ill-equipped to meddle in").

22.  Accordingly, the Court denies plaintiffs' requests for injunctive relief.

---

[177]  June 26, 2007, Vol. 2 at 5:20-25.
[178]  However, the Court notes that Equilon has made a colorable showing that implementation of plaintiffs' pricing scheme would adversely affect the consumers, and could result in higher prices as a consequence of compliance.  June 20, 2007, Vol. 2 at 37:23-38:4.  Such a result would not be in the public interest.  See ¶ 48, supra.
[179]  June 5, 2007, Vol. 2 at 12:18-13:13.

23.  The Court specifically rejects the contention that plaintiffs are entitled to equitable relief under the Robinson Patman Act, 15. U.S.C. §§ 13, 26, a claim they have never pled.[180]  The Court also rejects that plaintiffs are entitled to the presumption of harm to competition which arises under the Robinson-Patman Act where there are price differences.[181]  (Minute Order, May 15, 2007, Docket No. 337, pp. 3-5.)

24. Based on the foregoing, the Court concludes that Equilon is the prevailing party in this case.

* * * * * * * *

Equilon shall submit a proposed final judgment embodying the above as well as all prior rulings adjudicating plaintiffs' claims within ten days.

DATED: July 5, 2009

James V. Selna
United States District Judge

---

[180]  Plaintiffs' Proposed Conclusions of Law, ¶¶ 2, 7.
[181]  Plaintiffs' Proposed Conclusions of Law, ¶ 3.